RECEIVED

MAR 1 1 2009

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| RICHARD THIBODEAUX | CIVIL ACTION NO. 6:07-1278 |
| VERSUS | JUDGE DOHERTY |
| M-I, L.L.C., ET AL | MAGISTRATE JUDGE METHVIN |

## MEMORANDUM RULING

Currently pending before the Court is a motion for summary judgment filed by defendant, M-I, L.L.C. ("M-I") [Doc. 37], and a motion for summary judgment filed by plaintiff, Richard Thibodeaux [Doc. 39]. Both motions address whether or not plaintiff is a Jones Act seaman. 46 U.S.C. § 30104 [Docs. 37 and 39] Specifically, M-I (plaintiff's employer) seeks a judgment in its favor, finding plaintiff is not a Jones Act seaman and dismissing the Jones Act claim filed against M-I; plaintiff's motion seeks a judgment finding that he is a Jones Act seaman. Plaintiff has filed no opposition to M-I's motion for summary judgment. Although technically M-I's motion for summary judgment is unopposed, this Court will construe plaintiff's motion for summary judgment as not only a summary judgment motion, but also as an opposition to M-I's motion. Plaintiff's motion has been opposed by M-I, as well as all other defendants - *i.e.* Kerr-McGee Oil & Gas Corp. ("Kerr-McGee") and Diamond Offshore Drilling, Inc. ("Diamond"). [Docs. 41 and 42]

## Factual Background

The following facts, taken from M-I's "Statement of Uncontested Material Facts," are not in dispute[1]:

1) Richard Thibodeaux began his employment [as a service technician] with M-I [an oilfield contractor] several weeks before his accident on or about March 31, 2005;

2) Richard Thibodeaux underwent training at M-I in its yard in Scott, Louisiana, from March 31, 2005, through April 11, 2005;

3) Richard Thibodeaux was sent to the M/V ROWAN ALASKA, a jack-up rig on April 12, 2005;

4) Richard Thibodeaux remained on the M/V ROWAN ALASKA from April 12, 2005, until he returned from offshore on April 15, 2005;

5) Richard Thibodeaux was off duty on April 16, 2005, and April 17, 2005;

6) Richard Thibodeaux was assigned to the M/V OCEAN CONCORD on April 18, 2005, where he remained working rigging down M-I equipment through April 20, 2005;

7) Richard Thibodeaux returned from the M/V OCEAN CONCORD on April 20, 2005;

8) Richard Thibodeaux allegedly sustained his injuries on or about April 19, 2005, while aboard the jack-up rig, the M/V OCEAN CONCORD;

9) At the time of his alleged injuries, the M/V OCEAN CONCORD was owned by Diamond Drilling Company;

10) Kerr-McGee Operating Company chartered the M/V OCEAN CONCORD at the time Richard Thibodeaux allegedly sustained his injuries;

11) M-I, L.L.C. did not own and/or charter the M/V OCEAN CONCORD;

---

[1] As previously noted, plaintiff did not file an opposition to M-I's motion for summary judgment, and consequently, did not file a statement of contested material facts. However, plaintiff did file a statement of uncontested material facts, along with his motion for summary judgment. The facts listed above, unless noted, are those which are almost identical to plaintiff's statement of uncontested facts.

12) Richard Thibodeaux was sent to the M/V OCEAN CONCORD to assist another M-I, L.L.C. employee to remove M-I, L.L.C. equipment from the M/V OCEAN CONCORD when he allegedly sustained his injuries;[2]

13) Richard Thibodeaux was sent to the job on the M/V OCEAN CONCORD which was scheduled to last several days only;[3]

14) M-I, L.L.C. is an oilfield service contractor providing drilling mud and other related services to oilfield drillers/operators;

15) M-I, L.L.C. does not own drilling rigs.

16) Richard Thibodeaux has not worked with M-I after April 20, 2005.[4]

[Doc. 37-2]

Additionally, the following facts, taken from plaintiff's "Statement of Uncontested Material Facts," have not been disputed by either defendant:

14) Mr. Thibodeaux was unable to perform any work other than light duty work after his injury;

15) M-I was unable to provide additional M-I employees and/or equipment for the work performed on the M/V Ocean Concord;

16) Mr. Johnson, the senior service technician, requested but was not provided additional personnel and/or equipment from Diamond M initially;

17) Richard Thibodeaux never performed any work for M-I other than that done aboard the M/V Rowan Alaska and the M/V Ocean Concord and never did more than train at the onshore facilities of M-I;

---

[2]Plaintiff's statement of uncontested material fact on this issue reads as follows: "Richard Thibodeaux was assigned to the M/V Ocean Concord to work under another M-I employee by the name of Joshua Johnson to remove M-I equipment from the M/V Ocean Concord." [Doc. 39-10 ¶ 10]

[3]Plaintiff's statement of uncontested material fact on this issue reads as follows: "Richard Thibodeaux was assigned to the job, but did not know how long he would remain there." [Doc. 39-10 ¶ 11]

[4]Plaintiff contends he worked for M-I through April 21, 2005. [Doc. Nos. 39-2, p.3 and 39-10, ¶ 5.]

18) Mr. Johnson was an employee of M-I for three (3) years proceeding January of 2006 and in the last year he was with M-I, he was always a service technician who spent no work time on land or platforms and would say that he performed part of his work for M-I in the last year of his employment on vessels such as the Ocean Concord and the accident which forms the basis of this lawsuit would be included in that year;

19) Richard Thibodeaux spent sixty-seven (67) hours of his employment by M-I in the shop in training onshore and over one hundred and thirty (130) hours working as a seaman assigned to vessels.

[Doc. 39-10]

The Court notes no party asserts plaintiff had any duties related to the maintenance, custody or operation of any vessel to which he was assigned. Additionally, no party disputes plaintiff's sole purpose on the M/V ROWAN ALASKA was to remove an "auger system" previously installed on the vessel by M-I.

## Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. Proc. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Proc. 56(e).

"The moving party bears the burden of identifying an absence of evidence to support the nonmoving party's case." Capitol Indem. Corp. v. U.S., 452 F.3d 428, 430 (5th Cir. 2006). "Summary judgment is properly granted if the record does not contain appropriate summary judgment evidence which would sustain a finding in the nonmovant's favor on any issue as to which the nonmovant would bear the burden of proof at trial." Id. at 430-31. As noted by the Fifth Circuit:

> This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

In evaluating the evidence provided in support of, and in opposition to, a Motion for Summary Judgment, "the court must view facts and inferences in the light most favorable to the party opposing the motion." Hunt v. Rapides Healthcare Sys. LLC, 277 F.3d 757, 762 (5th Cir. 2001). "A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party." Id. In evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir.

2001).

## Analysis

"To maintain a cause of action under the Jones Act, the plaintiff must be a seaman. Land-based workers are not seamen." Hufnagel v. Omega Service Industries, Inc., 182 F.3d 340, 346 (5th Cir. 1999)(citing Harbor Tug and Barge Co. v. Papai, 520 U.S. 548, 554 (1997)). To qualify as a seaman under the Jones Act, plaintiff bears the burden of proving seaman status. Becker v. Tidewater, Inc., 335 F.3d 376, 390 (5th cir. 2003). The Supreme Court has established a two-part test to determine seaman-status:

> First ... an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission....
>
> Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.

Harbor Tug at 1540 (quoting Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995)).[5]

Defendant first argues, very briefly, that plaintiff cannot meet the first prong of the Chandris test, because his duties did not contribute to the function of the vessel or to the accomplishment of its mission. Defendant argues plaintiff's only duty was to remove the auger equipment, which did not contribute to the accomplishment of the vessel's mission.[6] Conversely, plaintiff merely lists the

---

[5] All parties agree the M/V OCEAN CONCORD was a vessel in navigation at the time of plaintiff's alleged injury. [See Docs. 39-2, p.2; 41, p.7]

[6] Specifically, defendant states as follows:

Once the equipment was removed, he [Mr. Thibodeaux] and his employer were not going to be working on the rig. As such, how did Thibodeaux's action contribute to the function of the drilling rig? ... The vessel in question is a drilling rig to drill for oil/natural gas. In our instance, Thibodeaux was on the rig for several days to remove some equipment only. He was not assigned to the rig nor does the removal of equipment contribute to the accomplishment of its mission.

first prong of the Chandris test, and then states he "clearly meets" this portion of the test, "as his duties aboard the vessel were in furtherance of its purpose." [Doc. 39-2, p.4] The Court finds there is insufficient information before it to decide, on summary judgment, whether or not plaintiff's duties "contribute[d] to the function of the vessel or to the accomplishment of its mission." Id. at 368. However, the parties have provided sufficient information such that the Court can make a determination as to the second element of the Chandris test - *i.e.* whether plaintiff had a connection to a vessel in navigation (or to an identifiable group of such vessels) which was substantial in terms of both its duration and its nature.

With regard to the second element, the Supreme Court provided the following guidance in Chandris:

> The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.
>
> . . .
>
> . . . A maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally land-based and therefore not a member of the vessel's crew, regardless of what his duties are. . . . Generally, . . . [a] worker who spends less than about thirty percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. . . . And where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict.

[Doc. 37-3, pp. 5-6]

Id. at 370 - 371. As the Fifth Circuit later noted:

> The requirement that a seaman have a substantial connection to a vessel or identifiable fleet of vessels serves to distinguish sea-based workers whose employment regularly exposes them to 'the perils of the sea,' from primarily land-based workers who have only sporadic or tangential connections to navigation. See Harbor Tug, 117 S.Ct. at 1540. Therefore, seaman-status is determined by the employee's entire employment-related connection to a vessel, and not by the immediate circumstances or location of the plaintiff's injury. See Chandris, 115 S.Ct. at 2187 ("[C]ourts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.") (internal quotation marks and citation omitted).

Hufnagel at 346.

Here, defendants argue plaintiff does not have a connection to a vessel or identifiable group of vessels, and consequently, he is not a Jones Act seaman. Defendants base their argument primarily upon the affidavit of plaintiff's supervisor, Christopher Dietzen, which states in pertinent part as follows:

> Christopher John Dietzen serves as a Senior Sales Service Manager for M-I SWACO for the Southeast area of the United States. M-I Swaco is an oilfield service company that contracts with oil companies/operators assisting those companies to drill for oil and natural gas both inland and offshore. ...
>
> Mr. Dietzen attested that as a Senior Sales Service Manager working for M-I Swaco as part of its Southeast United States operations out of Scott, Louisiana, he currently has over eighty service technicians working under him. He had a similar number of service technicians working under him in April 2005. Richard Thibodeaux was hired in March 2005 as a service technician. He underwent training whereupon he was assigned to set up equipment on the MV Rowan Alaska owned by Rowan Companies, Inc. He remained on the job briefly returning from offshore due to a family emergency. Within several days, Thibodeaux was sent to the M/V Ocean Concord as a service technician for M-I SWACO rig down/removed M-I Swaco equipment when he allegedly sustained a back injury on or about April 18, 2005. That job was scheduled to last two or three days only whereupon Thibodeaux was to return from that rig for job reassignment.
>
> Mr. Dietzen attested that Thibodeaux, as a service technician, is not normally assigned to anyone particular rig. Furthermore, service technicians working for M-I Swaco in the Southeast United States can either be assigned to offshore rigs, offshore

platforms/spars, as well as land rigs in performing their respective tasks. Furthermore, it is customary for service technicians to work on the premises of M-I, LLC d/b/a M-I SWACO located in Scott, Louisiana, on a frequent basis depending upon customer demand, i.e., ongoing drilling operations.

Be it known that Dietzen explained that all service technician assignments are customer driven. Those customers are various oil companies that M-I SWACO services on an ongoing basis. Currently, M-I SWACO services up to sixty different customers in the southeast United States that includes the Gulf of Mexico and the States of Louisiana, Texas, and Oklahoma. M-I SWACO also serviced roughly the same number of customers in April 2005. Still further, based on customer demand, Richard Thibodeaux and other such service technicians, are sent to as many as two-hundred different land and/or sea-based drilling rigs on an on-going basis. This was also the same approximate number of locations in April 2005. Further, normally, each job assignment for service technicians is normally anywhere from a few days up to a month or two at a maximum. Afterwards, the service technicians are sent to a different sea or land location for anyone of M-I's customers depending upon the needs of those aforementioned customers and their respective drilling operations.

Dietzen further attested that Thibodeaux and a fellow employee, Josh Johnston, was sent to the M/V OCEAN CONCORD to rig down and help remove some M-I SWACO equipment that was no longer needed on the rig. This job lasted three days only. Afterwards, Thibodeaux was going to be re-assigned to another operation whether it be on land or sea-rig/platform/spar depending upon customer demand. However, Thibodeaux allegedly sustained an injury during this rigging down job that is the subject of this lawsuit. This was Thibodeaux's second job assignment after working at another offshore location for several days.

Dietzen attested that Richard Thibodeaux, as a service technician, given that Thibodeaux was only hired several weeks prior to his alleged accident, would not have been assigned to one customer or any set of customers given his lack of experience. As such, had Thibodeaux returned from his assignment in April 2005 to be assigned to a new location, he would have been sent to one of the aforementioned approximate two-hundred different rig locations, land/or sea, in the southeast United States on behalf of M-I SWACO - dependent on customer demand at that particular time. Further, those prospective jobs would have been either a few days up to a maximum of a few weeks. If ,no jobs were available at a given moment, Thibodeaux, like other service technicians, would have been assigned yard duty in Scott, Louisiana, performing any number of different tasks to prepare for other customer drilling operations.

[Doc. 37-3, p. 1]

Plaintiff, on the other hand, argues he "had a 100% connection to the Ocean Concord that was substantial in duration and nature," and thus, plaintiff argues he is a Jones Act seaman. [Doc. 39-2, p. 6] In support of his argument, plaintiff has submitted his employee time sheets, which he summarizes as follows:

> Mr. Thibodeaux spent the first sixty-seven (67) hours of his employment by **M-I** in the shop in training onshore. Thereafter, he spent seventy-three (73) hours on his first offshore vessel job, including travel, and on his second offshore vessel job fifty-nine (59) recorded hours plus another three (3) hours travel on April 21, 2008. That means that he spent over 130 hours working as a seaman assigned to vessels. He never worked on land, only trained there.

[Doc. 39-2, p.3 (emphasis in original)] Plaintiff also points out his co-worker, Mr. Joshua Johnson, who was working with plaintiff at the time of the accident, testified at his deposition that he was employed by M-I for three years, and in the last year of his employment he worked as a service technician and spent all of his time working on "vessels such as the OCEAN CONCORD." [Doc. 39-8, pp. 3-4]

The uncontroverted evidence submitted to the Court shows from March 31, 2005 to April 12, 2005 (an almost two week time period), plaintiff worked at M-I's land-based facility, undergoing employee training. On April 12, 2005, plaintiff was dispatched to the M/V ROWAN-ALASKA, a jack-up rig owned by Rowan Companies, Inc. Four days into this job (*i.e.*, April 16, 2005), plaintiff was flown home from the rig due to a family emergency. On April 18, 2005, plaintiff was dispatched to the M/V OCEAN CONCORD, a jack-up rig owned by Diamond Offshore. Plaintiff completed that job on either April 20 or 21, 2005. The foregoing is the extent of plaintiff's employment with M-I, and the extent of plaintiff's employment-related connection(s) to a vessel in navigation or an identifiable group of such vessels. Plaintiff has put forth no evidence showing a connection to the M/V OCEAN CONCORD that is substantial in both duration and nature; his

assignment to that vessel lasted a mere three or four days, and the evidence submitted shows plaintiff likely would have been assigned to another rig (either land or sea based) had he remained with M-I, and the rig likely would have had a different owner that did the M/V OCEAN CONCORD.

Although not abundantly clear, plaintiff also appears to make the argument that the Court should look to all of plaintiff's work aboard vessels while employed with M-I. Plaintiff admits the two vessels to which he was assigned were not under common ownership or control, but seems to argue common ownership or control is unnecessary under the facts of this matter. On this point, plaintiff states as follows:

> The Plaintiff never worked on land. **All of his work was done on vessels.** Those vessels were separately owned and operated. In Papia [sic], supra, the Court held that the fleet rule applies only when the vessels are under common ownership or control.
>
> But, the [Papai] Court also held that the Plaintiff was not a seaman on the date of his injury because he was hired for a one-day job of painting a vessel which was secured to the dock and he was not going to sail aboard it thereafter. Mr. Thibodeaux was employed in a seagoing nature for over three (3) days removing the auger equipment while the Ocean Concord was in navigation. That is a clear distinction in the activities of a painter on a moored vehicle for one day and a service hand dismantling an auger system on a vessel in tow for three (3) plus days.

[Doc. 39-2, pp. 4-5 (emphasis in original)][7]

---

[7]Plaintiff further relies on Bertrand v. International Mooring and Marine, Inc., 700 F.2d 240 (5th Cir. 1983), which allowed an injured worker to assert a Jones Act claim, even though the "employer neither own[ed] nor control[led] the several vessels upon which the seaman work[ed]." Bertrand at 245. However, the Fifth Circuit has limited Bertrand to the specific facts of that case. *See* Burris v. Commercial Testing & Eng'g Co., 736 F.2d 307, 311 (5th Cir. 1984)( "Although Bertrand thus expanded the concept of a fleet to encompass vessels used, but not owned or chartered, by the employer, we do not believe that it can fairly be read so broadly as to confer seaman status on every worker whose duties place them aboard a large number of randomly-owned and controlled vessels for short periods of time that aggregate to comprise a substantial portion of his working time, nor do we believe that Bertrand rejected the identifiable or recognizable fleet requirement established by our prior cases. Rather, Bertrand must be read in light of the factual situation it involved.")

However, Papai actually held as follows:

> Jones Act coverage is confined to seamen, those workers who face regular exposure to the perils of the sea. An important part of the test for determining who is a seaman is whether the injured worker seeking coverage has a substantial connection to a vessel or a fleet of vessels, and ***the latter concept requires a requisite degree of common ownership or control.*** The substantial connection test is important in distinguishing between sea- and land-based employment, for land-based employment is inconsistent with Jones Act coverage. This was the holding in Chandris, and we adhere to it here. The only connection a reasonable jury could identify among the vessels Papai worked aboard is that each hired some of its employees from the same union hiring hall from which Papai was hired. That is not sufficient to establish seaman status under the group of vessels concept. Papai had the burden at summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Fed. Rule Civ. Proc. 56(e). He failed to meet it.

Id. at 560 (emphasis added). The same can be said of Mr. Thibodeaux: the only connection a reasonable jury could identify among the vessels upon which Mr. Thibodeaux worked is that the owner of each vessel hired the same oilfield service provider - plaintiff's employer. Like Papai, that connection is insufficient to establish seaman status under the group of vessels concept.

Defendant has put forth evidence, through the affidavit of Christopher Dietzen, which shows plaintiff did not have a connection to a vessel or fleet of vessels, but rather was "primarily a land-based worker[] who ha[d] only sporadic or tangential connections to navigation." Hufnagel at 346. Plaintiff has failed to come forward with evidence of his own showing there is a genuine issue of material fact as to plaintiff's seaman status.[8] Due to the foregoing, defendant M-I's Motion for Summary Judgment [Doc. 37] is GRANTED, and plaintiff's Motion for Summary Judgment [Doc.

---

[8] Plaintiff makes a very brief attempt to argue that he was a borrowed employee of Kerr-McGee Oil and Gas Corporation and/or Diamond Offshore Services Company, and therefore, those entities should also be liable under the Jones Act. The Court has found plaintiff is not a Jones Act seaman; whether or not he was a borrowed employee of Kerr-McGee has no bearing on that determination.

39] is DENIED.

THUS DONE AND SIGNED this \_\_11\_\_ day of \_\_March\_\_, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE